06-2628-cr
United States v. Magassouba

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

---

August Term, 2006

(Argued: May 10, 2007             Decided: September 19, 2008)

Docket No. 06-2628-cr

---

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

MOUSTAPHA MAGASSOUBA,

*Defendant-Appellant*.

---

Before:

B.D. PARKER, RAGGI, and WESLEY, *Circuit Judges*.

Appeal from an order of the Southern District of New York (Deborah A. Batts, *Judge*) (1) denying defendant's motion for dismissal of the indictment and unconditional release from federal custody; and (2) ordering defendant's commitment for psychiatric treatment, including the involuntary administration of antipsychotic medication, pursuant to 18 U.S.C. § 4241(d)(2)(A) (2006).

AFFIRMED.

1

ANDREW R. POLLAND (John P. Cooney, Jr., *on the brief*), New York, New York, *for Defendant-Appellant*.

MARIA E. DOUVAS, Assistant United States Attorney (Jonathan S. Kolodner, Assistant United States Attorney, *on the brief*), *for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

REENA RAGGI, *Circuit Judge*:

Defendant Moustapha Magassouba appeals from a May 10, 2006 interlocutory order of the United States District Court for the Southern District of New York (Deborah A. Batts, *Judge*) that (1) denied his motion to dismiss the indictment charging him with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A), 846; and (2) ordered his hospitalization pursuant to 18 U.S.C. § 4241(d)(2)(A) for psychiatric treatment, including the involuntary administration of antipsychotic medication. On this appeal, Magassouba does not dispute the merits of the district court's findings that (a) he is incompetent to stand trial, see 18 U.S.C. § 4241(d); (b) there is a substantial probability that, with treatment, he could attain competency in the foreseeable future, see id. § 4241(d)(2)(A); or (c) the circumstances of his case satisfy the criteria for involuntary treatment specified in Sell v. United States, 539 U.S. 166 (2003). Instead, he argues that, at the time of the challenged order, the district court lacked authority to commit him for psychiatric treatment. He further submits that the length of his

2

unauthorized confinement violated due process so as to require the dismissal of his indictment and his release from custody.

Magassouba's arguments largely depend on the construction of § 4241(d), a statute that authorizes a district court to commit a mentally incompetent defendant to custodial hospitalization (1) for a reasonable period "not to exceed four months" to determine whether he can attain competency to stand trial, 18 U.S.C. § 4241(d)(1); and, (2) if the court finds a "substantial probability" that the defendant can attain such competency in the "foreseeable future," for an additional "reasonable period" of appropriate treatment, id. § 4241(d)(2)(A). Magassouba submits that a district court is only authorized to order additional hospitalization if it makes the requisite substantial probability finding under § 4241(d)(2)(A) within the term of a defendant's § 4241(d)(1) confinement, which was not done in this case.

The government submits that we lack jurisdiction to hear this interlocutory appeal. Alternatively, it challenges defendant's arguments on the merits.

For the reasons stated herein, we conclude that the collateral order doctrine supports our exercise of jurisdiction. We further conclude that the district court did not exceed its authority in ordering Magassouba's § 4241(d)(2)(A) commitment for additional custodial hospitalization and involuntary psychiatric treatment. We agree with defendant that § 4241(d) does not permit an incompetent defendant to be held in uninterrupted custodial hospitalization unless a district court finds, before the expiration of a defendant's initial term of § 4241(d)(1) confinement (which cannot exceed four months), that circumstances warrant

3

additional hospitalization pursuant to § 4241(d)(2)(A). Thus, when a defendant's term of § 4241(d)(1) confinement expires and no § 4241(d)(2) order has yet been entered, the Attorney General lacks statutory authority to hold a defendant in further custodial hospitalization. But we cannot agree that the statute also limits a district court's authority to enter a § 4241(d)(2)(A) order to the term of § 4241(d)(1) confinement. Such a construction could itself raise constitutional concerns to the extent it failed to afford a defendant a reasonable time to secure and present evidence in opposition to additional § 4241(d)(2)(A) hospitalization, particularly hospitalization involving involuntary medication. See Sell v. United States, 539 U.S. at 180-81.

In this case, it appears that the Attorney General exceeded his § 4241(d) authority by holding Magassouba in custodial hospitalization for a few weeks longer than the four months authorized by the district court's § 4241(d)(1) order. We conclude that this error was harmless because Magassouba was not subjected to psychiatric treatment during this unauthorized hospitalization, and his general confinement was otherwise authorized by the Bail Reform Act, 18 U.S.C. § 3142. Thus, the error could not deprive the district court of its authority subsequently to enter the challenged § 4241(d)(2)(A) order.

We further conclude that Magassouba's nineteen-month detention from the time he was found incompetent until the date of the challenged order was not constitutionally unreasonable so as to violate due process. Magassouba's refusal to accept treatment that his own lawyers acknowledged would likely render him competent required the district court

4

carefully to consider a host of medical and legal factors that due process demands be satisfied before a defendant can be hospitalized for involuntary medication. See Sell v. United States, 539 U.S. at 180-81.

Accordingly, we affirm the challenged order denying dismissal of the indictment and ordering further hospitalization and treatment pursuant to 18 U.S.C. § 4241(d)(2).

## I. Background

### A. The Indictment and § 3142 Order of Detention

Moustapha Magassouba is a citizen of Guinea who has resided in the United States since 1990. On August 12, 2003, a grand jury sitting in the Southern District of New York charged Magassouba in a one-count indictment with conspiracy to distribute one kilogram or more of heroin, a crime carrying a sentencing range from ten-years-to-life incarceration. See 21 U.S.C. §§ 841(a)(1) & (b)(1)(A), 846. This charge gave rise to a presumption of detention under the Bail Reform Act, 18 U.S.C. §§ 3142(e), (f)(1)(C) (establishing rebuttable presumption "that no condition or combination of conditions will reasonably assure the [defendant's] appearance . . . and the safety of the community" for drug offenses carrying maximum prison sentence of ten years or more), and Magassouba was ordered detained under this statute without objection.

A few months later, in November 2003, defendant's initial attorney was relieved and present counsel was appointed by the court. At no time in the district court did past or present counsel challenge the § 3142 detention order or seek its amendment. On January 29,

5

2004, however, defense counsel raised a concern as to Magassouba's mental competence. To understand the proceedings that ensued and defendant's challenge on this appeal, it is necessary briefly to outline the federal statutory scheme for resolving the competency of criminal defendants.

> B.    The Statutory Scheme for Determining a Criminal Defendant's Competency

> > 1.    The Initial Competency Determination

When a criminal defendant's competency is called into question, 18 U.S.C. § 4241(d) requires the district court to make a preliminary finding as to whether a preponderance of the evidence demonstrates that the defendant is, in fact, incompetent, i.e., whether a "mental disease or defect" renders him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  To make this determination, the district court must conduct a hearing at which the defendant, represented by counsel, is afforded an opportunity to testify and to call and confront witnesses.  See 18 U.S.C. §§ 4241(a), (c) & 4247(d).  Prior to this hearing, the district court "may order" a psychiatric or psychological examination of the defendant.  Id. § 4241(b).  To effect such examination, the court "may" order the defendant committed "to the custody of the Attorney General for placement in a suitable facility."  Id. § 4247(b).  This commitment may not "exceed thirty days," although the statute permits the director of the designated commitment facility to apply for a "reasonable extension . . . not to exceed fifteen days."  Id.

6

2.     The Evaluation and Treatment of Incompetent Defendants

If the district court makes a preliminary finding of incompetence, the second step of the statutory scheme – at issue in this case – mandates the defendant's custodial hospitalization for evaluation and possible treatment. The district court "shall commit the defendant to the custody of the Attorney General," who "shall hospitalize the defendant for treatment in a suitable facility." Id. § 4241(d). Initially, such hospitalization seeks "to determine whether there is a substantial probability that in the foreseeable future [the defendant] will attain the capacity to permit the proceedings to go forward." Id. § 4241(d)(1). This evaluative hospitalization is limited to "a reasonable period of time, not to exceed four months." Id. Thereafter, "if the court finds that there is a substantial probability" that the defendant "will attain the capacity to permit the proceedings to go forward," the law provides for further hospitalization "for an additional reasonable period of time." Id. § 4241(d)(2)(A).

3.     The Final Competency Determination

At the conclusion of the specified hospitalization commitment, if the court determines that the defendant has not attained the competency necessary to proceed to trial, § 4241(d) provides for the defendant to be referred for civil commitment pursuant to 18 U.S.C. §§ 4246 and 4248. If, however, the director of the hospital facility to which the defendant is committed determines that he has attained the requisite mental competency, the director shall so certify to the court, which must then hold another competency hearing. See 18 U.S.C. §

7

4241(e). If the court then finds by a preponderance of the evidence that the defendant is competent to stand trial, it "shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings." Id. Upon such discharge, the defendant is "subject to the provisions of chapters 207 and 227," which include the detention provisions of the Bail Reform Act. Id.

     C.     The Competency Proceedings Leading to the Challenged Order

          1.     The District Court Finding of Magassouba's Incompetency

When, on January 29, 2004, defense counsel voiced concern about Magassouba's mental competency, the district court did not order confinement for examination pursuant to 18 U.S.C. §§ 4241(b) and 4247(b). Instead, on January 30, 2004, it granted the defense motion to have Magassouba, who was then confined in the Metropolitan Detention Center ("MDC") pursuant to the Bail Reform Act, 18 U.S.C. § 3142, examined at that Brooklyn facility by a private psychologist, Dr. Gary Robert Collins. In a report dated March 31, 2004, Dr. Collins expressed his expert opinion that Magassouba was incompetent to stand trial. Dr. Collins found that Magassouba suffered from a psychotic disorder, with the most likely diagnosis being Delusional Disorder, Mixed Type.[1] Dr. Collins concluded that, as a result

---

[1]As Dr. Collins detailed in his report, a person with this disorder "suffers from false fixed beliefs of a 'nonbizarre' quality." Dr. Collins determined that Magassouba suffered specifically from persecutory delusions, i.e., he believed that the judge, the attorneys, and unknown court personnel involved in his case were conspiring against him and that his mother-in-law was trying to kill him.

of this disorder, the defendant lacked both a reasonable degree of rational understanding of the proceedings against him and a present ability to consult with his attorneys with a reasonable degree of rational understanding. The doctor recommended Magassouba's hospitalization for a full medical and psychiatric-neurological evaluation and possible treatment with antipsychotic medication.

On October 13, 2004, at a competency hearing held pursuant to 18 U.S.C. § 4241(a), the district court heard directly from Dr. Collins, and from the Drug Enforcement Administration agent who had arrested Magassouba and reviewed telephone conversations between defendant and his wife recorded while the former was incarcerated in this case. The court found by a preponderance of the evidence that the defendant was "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to assist properly in his defense, . . . and perhaps may not even understand the nature of the charges against him and the consequences of the proceedings." Hearing Tr., Oct. 13, 2004, at 76.

### 2. Magassouba's Commitment Pursuant to § 4241(d)(1)

At the conclusion of the October 13, 2004 hearing, the district court orally ordered Magassouba committed pursuant to § 4241(d)(1) "to the custody of the Bureau of Prisons ['BOP'] for a period of 60 days, during which time he shall be placed in a suitable hospital setting so that he may receive treatment to restore competency and to be evaluated further to determine whether there is a substantial probability that he will attain mental competency

9

in the foreseeable future." Id. at 77. The BOP was ordered to detail its determination as to the probability of Magassouba regaining competency in a written report to be filed with the court "[w]ithin 30 days of the expiration of this 60 day order," id., in short, by January 11, 2005. The order granted the parties two weeks thereafter to file written responses to the BOP report, after which the court would schedule a second competency hearing "as soon as is practicable." Id.[2]

### 3. The Bureau of Prisons' § 4241(d)(1) Report

Various circumstances contributed to the BOP not filing its evaluation report until May 27, 2005, more than seven months after the district court's initial hospitalization order. Notably, on or about November 18, 2004, more than a month after the district court had orally ordered Magassouba hospitalized for evaluation, prosecutors learned that the order had not yet been executed by the United States Marshals Service, apparently because the marshals had never received notice of the directive. The government alerted the district court to this fact, and, on November 22, 2004, the court reduced its commitment order to writing. The order was entered on the docket on November 24, 2004, and presumably transmitted to the Marshals Service at or about that time.

---

[2] Had this schedule been adhered to, it is conceivable that the district court have decided whether further hospitalization pursuant to § 4241(d)(2)(A) was warranted before February 14, 2005, four months after its oral § 4241(d)(1) order.

10

A month later, on December 22, 2004, Magassouba was finally admitted to the BOP hospital facility in Butner, North Carolina ("Butner").[3] By letter dated December 28, 2004, Butner's Warden wrote to the district court requesting that the ordered evaluation period commence with Magassouba's arrival at Butner and that the period be extended from 60 days to four months, ending on April 20, 2005. The district court granted the Warden's request on January 4, 2004, ordering the BOP to submit its written findings 30 days after the close of this evaluation period, i.e., on May 20, 2005. The court also scheduled a competency hearing for June 15, 2005. No party objected to this amended § 4241(d)(1) order.

Approximately six weeks later, on February 15, 2005, defense counsel sent a letter to the government's attorneys requesting the BOP's prompt completion of Magassouba's evaluation and noting that "significant due process concerns" were implicated in the length of defendant's evaluation confinement. Cooney Letter to Douvas, Feb. 15, 2005. Nothing in the record before this court indicates that a copy of this letter was filed with the district court, or that defense counsel otherwise objected to or sought amendment of the schedule set by the district court.

On May 3, 2005, four months and two weeks after Magassouba arrived at Butner, officials at that facility informed the marshals that "[t]he period of study and observation concerning the [defendant] has ended. He is now ready to be returned to [the Southern

---

[3] In the interim, Magassouba had apparently written to the district court seeking reconsideration of its incompetency finding and replacement of counsel. The district court denied both applications by order dated December 9, 2004.

11

District of New York] for continuation of proceedings." Memorandum from Cruze, Inmate Systems Manager at FMC Butner, to U.S. Marshals Service, May 3, 2005. Nine days later, on May 12, 2005, deputy marshals transported Magassouba back to New York where he has since been housed at the Metropolitan Correction Center ("MCC") in Manhattan.

On May 27, 2005, one week after the court-ordered May 20, 2005 filing deadline, the BOP issued a twenty-page single-spaced report of its determination as to the probability of Magassouba's regaining competency. Like Dr. Collins, the evaluating BOP psychiatrist and psychologist diagnosed Magassouba to have a Delusional Disorder, Mixed Type. The doctors reported that this disorder "prevents [Magassouba] from possessing a rational understanding of the charge against him," which "inhibits his ability to assist in his own defense." BOP Evaluation at 7. Further, Magassouba's "mental disease causes him to be unable to communicate verbally in a meaningful fashion with his attorney," in part because it caused him to hold "delusional beliefs" about his counsel as well as the prosecutors. Id. at 8.

The BOP evaluators nevertheless determined that it was substantially likely that Magassouba could regain competency through a course of psychotropic medication, which they explained in some detail. At the same time, they noted that, while at Butner, Magassouba had "rigidly opposed" taking any such medication, insisting that he was "not mentally ill." Id. at 7. Because Magassouba did not pose a threat to himself or others at the hospital facility, Butner officials had concluded that he did not meet the BOP's

12

administrative criteria for involuntary medication derived from <u>Washington v. Harper</u>, 494 U.S. 210 (1990). <u>Id.</u> at 9. Nevertheless, the BOP doctors reported that involuntary medication for purposes of restoring competency might be authorized by the court pursuant to <u>Sell v. United States</u>, 539 U.S. 166. <u>Id.</u> In <u>Sell</u>, the Supreme Court had ruled that an incompetent defendant may be involuntarily medicated for the sole purpose of rendering him competent to stand trial only if four criteria are satisfied: (1) there are important government interests in trying the individual; (2) the treatment will significantly further those interests; (3) the treatment is necessary to further those interests, considering any less intrusive alternatives; and (4) the treatment is medically appropriate. <u>See id.</u> at 180-81. While the BOP evaluators reported that the first factor was outside the scope of their medical expertise, they discussed in detail how the remaining three factors supported Magassouba's involuntary medication.

4. The Parties' Joint Proposal for Treatment to Help Magassouba Attain Competency

On June 3, 2005, within days of receiving the BOP report, the district court afforded the parties thirty days within which to submit responses. In a June 29, 2005 letter response, defense counsel did not complain that Magassouba had been detained beyond the time permitted by statute, or that the district court lacked authority to order his further commitment or treatment, the arguments raised on this appeal. Instead, defense counsel joined with the government in agreeing with the BOP's determination that Magassouba's "competence could be restored with the administration of antipsychotic medication." Cooney

13

Letter to Judge Batts, June 29, 2005, at 1; see Douvas Letter to Judge Batts, July 1, 2005, at 1 (urging that defendant be treated according to plan proposed by defense "to restore defendant's competency status"). In a proposed order, submitted by defense counsel on July 13, 2005, with the government's consent, the parties urged the district court to order Magassouba hospitalized for treatment "with or without defendant's consent" according to a modified version of the BOP treatment plan "consistent with the goals of restoring defendant's competency status and/or diagnosing his psychiatric and medical condition." Proposed Order at 3, accompanying Polland Letter to Judge Batts, July 13, 2005.[4]

### 5. The District Court's Request for Additional Information

Despite the parties' agreement, the district court did not sign the jointly proposed order. Instead, on July 15, 2005, it ordered that, within thirty days, the prosecution and the BOP provide the court with more information to assist it in determining the propriety of involuntary treatment consistent with Sell v. United States, 539 U.S. 166. To ensure the first Sell factor, i.e., that the government's interest in bringing Magassouba to trial was sufficiently important to overcome the defendant's interest in refusing the involuntary

---

[4] The modified plan, set forth in a June 29, 2005 letter from defense counsel to the court and agreed to by the government, sought to provide treating physicians with "a more expansive range of options" than specified in the BOP evaluation report, by (1) expanding the "range of doses" for medications specified in the report, (2) authorizing "alternative and additional drugs," (3) authorizing "additional antipsychotic and mood stabilizing drugs . . . as contingent medications," and (4) authorizing "continued psychotherapy . . . as an additional treatment to supplement drug therapy." Cooney Letter to Judge Batts, June 29, 2005, at 1-2.

14

administration of drugs (the one issue not addressed by the BOP in its evaluation), the district court instructed the government to submit a "written offer of proof" with respect to the charged crime. Order, July 15, 2005, at 1. The court further directed the BOP to explain more particularly why it was "medically appropriate forcibly to administer antipsychotic drugs to an individual who is (1) not dangerous and (2) is competent to make up his own mind about treatment." Id. at 2 (emphasis in original).

6.    The Parties' Responses and Renewed Request for Involuntary Treatment

By letter dated August 15, 2005, the prosecution declined to provide the requested offer of proof, stating that the government's strong interest in pursuing Magassouba's prosecution could be inferred from the ten-year mandatory minimum sentence that he faced if convicted of the charged conspiracy. Dissatisfied with what it characterized as a "nonresponse response," the district court issued a new order on August 18, 2005, directing the government for a "second time" to provide an offer of proof. Order, Aug. 18, 2005, at 1. The prosecution complied by filing a sealed, ex parte submission on September 2, 2005.[5]

_____

[5] Because Magassouba does not challenge the district court's ultimate conclusion that the government satisfied the Sell factors for ordering involuntary medication, we have no occasion on this appeal to consider the propriety of such an ex parte, sealed offer of proof. Cf. United States v. Abuhamra, 389 F.3d 309 (2d Cir. 2004) (holding that ex parte, in camera submissions from the government should generally not be entertained in denying bail release). Similarly, we need not address the government's argument that such a proffer was unnecessary to establish the first Sell factor in light of the nature of the charge against Magassouba and its ten-year mandated minimum penalty.

Meanwhile, the BOP inexplicably failed to respond to the district court's July 15, 2005 order until November 10, 2005. Its belated submission explained that, although Magassouba posed no threat of harm and was competent to make medical treatment decisions, an involuntary treatment order was "medically appropriate" from a "cost/benefit standpoint," in that the "potential for benefit from psychotropic medication would far [outweigh] the potential for significant adverse reactions." BOP Addendum to Evaluation at 1-2.

Thereafter government and defense counsel submitted letters to the district court that reiterated their agreement that Magassouba was incompetent to stand trial and that psychotropic medication would likely restore his competency. They each requested that the court order such treatment, involuntarily if necessary.[6]

### 7. The District Court's Efforts to Secure Magassouba's Voluntary Submission to Treatment

Even after the parties had thus communicated for a second time their agreement on the propriety of an order authorizing defendant's involuntary medication, the district court

---

[6] Defense counsel noted that, although Magassouba refused to consent to antipsychotic medication while at Butner, he had never been ordered by the court to submit to such treatment. Accordingly, counsel requested "that any forthcoming Order on this issue direct Mr. Magassouba to take the medication prescribed by his treating doctor(s) on his own accord, and only authorize the forcible administration of such drugs in the event he refuses to comply with the Court's order." Polland Letter to Judge Batts, Dec. 2, 2005, at 3; see Douvas Letter to Judge Batts, Dec. 6, 2005, at 4 (requesting order that BOP "medicate the defendant involuntarily should the defendant refuse to comply with the Court's [treatment] directive").

16

opted to proceed more cautiously. On January 3, 2006, the court entered an order finding that Magassouba was incompetent to stand trial and likely to remain so absent medication. The order employed language strongly encouraging Magassouba's voluntary submission to medication, but it stopped short of authorizing involuntary administration:

> Without medication, Mr. Magassouba continues to be incompetent to proceed to trial. Mr. Magassouba has declined to be medicated. Mr. Magassouba has been found not to be a danger to others or to himself.
>
> Mr. Magassouba represents that he wishes to move forward in this matter. In order for this court to find him competent, however, Mr. Magassouba has to voluntarily accept and continue medication. Until that time, this Court's finding of his incompetence stands.

Order, Jan. 3, 2006, at 1.

By letter dated January 27, 2006, defense counsel advised the court that Magassouba had directed them to convey his unwillingness to accept medication voluntarily. On January 30, 2006, the government renewed its motion for involuntary medication. The next day, the court summarily denied the motion.

8.  Magassouba's Motion for Dismissal of the Indictment and Unconditional Release

Two months later, on March 22, 2006, defense counsel moved for dismissal of the indictment and for Magassouba's unconditional release. Counsel argued – for the first time – that the district court lacked authority to order Magassouba's additional hospitalization and treatment pursuant to § 4241(d)(2)(A) because it had not made a finding of a substantial probability that the defendant would attain competence in the foreseeable future within four months of defendant's § 4241(d)(1) commitment, as required by statute. Alternatively,

17

counsel argued that defendant's continued confinement to attain competency exceeded the "reasonable" period contemplated by the statute and the Due Process Clause.

The prosecution opposed the motion in a letter dated April 26, 2006. It argued that Magassouba was not being detained in violation of § 4241(d) because his hospitalization under that statute had ended more than a year earlier. It submitted that Magassouba's present detention in the MCC was pursuant to the Bail Reform Act, 18 U.S.C. § 3142, and based on the court's unchallenged finding at the time of defendant's arraignment that he posed a presumptive risk of flight and danger to the community. To the extent Magassouba had not yet been brought to trial because of his incompetence, the prosecution asserted that his ability to regain competence was undisputed. Examining government and defense experts agreed that, with recommended medication, there was a substantial probability that the defendant would attain competence in the foreseeable future. The reason this probability had not been realized was that defendant refused to take the prescribed medication. Under these circumstances, the prosecution argued that Magassouba should not be allowed to use his incompetence as both a shield to avoid trial and a sword to demand unconditional release. It urged the district court to take the steps necessary to bring the case to trial, i.e., (1) formally find under § 4241(d)(2) a substantial probability that, with the recommended medication, Magassouba would attain competency; and (2) order that the recommended medication be administered, involuntarily if necessary pursuant to Sell v. United States, 539 U.S. 166.

18

9. The Challenged Order Denying Dismissal and Ordering Involuntary Medication

By order dated May 10, 2006, the district court denied Magassouba's motion for dismissal and release. In so ruling, the court rejected the defense argument that it had failed to make the findings required by § 4241(d)(2). The court observed that the requisite finding that, with treatment, Magassouba could regain competence was implicit in its order seeking further information as to the propriety of ordering such treatment to be administered even involuntarily. While expressing a general reluctance to order involuntary medication for a defendant who posed no danger to himself or others, the district court acknowledged that such an order might be warranted to "move the criminal process forward" when a defendant, such as Magassouba, deliberately refused treatment likely to render him competent to stand trial. Order, May 10, 2006, at 3. Specifically detailing how each of the four Sell factors were satisfied in the case, the court ordered Magassouba "committed to the custody of the Attorney General for psychiatric treatment, including the involuntary administration of anti-psychotic medication . . . in accordance with the Proposed Treatment Plan set forth in Defense counsel's letter of June 29, 2005, and agreed to by the Government." Id. at 4-5.

Magassouba appeals this commitment order.

II. **Discussion**

A. Jurisdiction

The government submits that this court lacks jurisdiction to hear Magassouba's appeal because the challenged order is not a "final decision" of the district court. 28 U.S.C. § 1291.

19

The final-decision rule applies with particular force in criminal cases, which we generally review only after sentence has been imposed and a judgment of conviction entered.  See United States v. Robinson, 473 F.3d 487, 490 (2d Cir. 2007); United States v. Olmeda, 461 F.3d 271, 278 (2d Cir. 2006); United States v. Gold, 790 F.2d 235, 237 (2d Cir. 1986).  An order denying a motion to dismiss an indictment is usually viewed as "interlocutory and not appealable."  United States v. Midland Asphalt Corp., 840 F.2d 1040, 1042 (2d Cir. 1988).

Under the collateral order doctrine, the law nevertheless recognizes a small class of preliminary rulings, even in criminal cases, as final when they (1) conclusively resolve a disputed question that (2) is an important issue completely separate from the merits of the action, and that (3) would be effectively unreviewable on appeal from a final judgment.  See, e.g., Flanagan v. United States, 465 U.S. 259, 265 (1984) (and cases cited therein); accord United States v. Robinson, 473 F.3d at 490-91 (and cases cited therein).  Applying this three-part test in United States v. Gold, 790 F.2d 235, this Court concluded that a § 4241(d)(1) commitment order was immediately appealable.  Gold observed that the order was based on a finding that defendant was incompetent to stand trial, which was conclusive in requiring defendant's custodial hospitalization for up to four months.  See 790 F.2d at 239.  A finding of present incompetency to stand trial was, moreover, distinct from the expected trial issue of Gold's competency to commit the charged crime.  See id. at 238.  Finally, the order was effectively unreviewable on appeal from a final judgment because if defendant were never tried or were tried and acquitted, there would be no appellate review, and if he were tried and

20

convicted, no meaningful relief would be available. See id. at 239 (noting that "[w]hether or not the conviction were set aside, nothing could recover for the defendant the time lost during his confinement; probably no one could be held liable to him in damages for the loss of his liberty").

While Gold's reasoning as to the appealability of § 4241(d)(1) hospitalization commitment orders would seem to apply with equal force to § 4241(d)(2) orders for additional custodial hospitalization,[7] we note one concern in relying on its conclusion that the challenged order "conclusively determine[d] Gold's present right to be at liberty prior to trial." Id. Gold does not indicate whether the § 4241(d)(1) order was the sole ground for the defendant's confinement or whether he was also detained pursuant to 18 U.S.C. § 3142. See id. at 236 (noting simply that defendant "was arrested and sent to the United States Medical Center for Federal Prisoners in Springfield, Missouri" for preliminary competency examination). An observation in United States v. Filippi suggests that the answer might be relevant to the application of the collateral order doctrine. See 211 F.3d 649, 650-51 (1st Cir. 2000) (holding that collateral order doctrine supported jurisdiction to review challenged § 4241(d)(1) order in case where defendant was not otherwise detained, while noting that he

_____

[7] Gold itself observed that its reasoning would not apply to § 4241 orders that committed a defendant for preliminary examination as to competency. See Gold v. United States, 790 F.2d at 239. As this court subsequently explained in United States v. Barth, 28 F.3d 253, 255-56 (2d Cir. 1994), such a "first-step" order does not "resolve an important issue" distinct from the merits of the action, specifically, defendant's competency to stand trial. Rather, it "is a preliminary step" to the district court's "ultimate determination" of that issue. Id. at 255.

21

was "not being detained as a flight risk or danger to the community" under 18 U.S.C. § 3142). Whether the custodial hospitalization pursuant to § 4241(d)(1) or (d)(2) of a defendant who is already generally detained pursuant to § 3142 qualifies as an appealable final order in every case is not something we need here decide because the § 4241(d)(2)(A) order here at issue not only commits Magassouba for an additional period of hospitalization, but also authorizes his involuntary medication.

In Sell v. United States, the Supreme Court ruled that a § 4241(d) order authorizing the involuntary medication of an incompetent defendant is an immediately appealable collateral order. 539 U.S. at 177. Sell observed that (1) an involuntary medication order conclusively resolves the legal question of the defendant's right to refuse treatment, which (2) is a legal question of constitutional significance separate from the merits of the underlying criminal action, that (3) is effectively unreviewable on appeal from a final judgment because, by that time, the defendant would have undergone the compelled medication he sought to avoid. See id. at 176-77 (noting that defendant "cannot undo that harm even if he is acquitted. Indeed, if he is acquitted, there will be no appeal through which he might obtain review"). Following this precedent, we conclude that the collateral order doctrine affords us jurisdiction over this appeal, because the challenged order authorizes Magassouba's involuntary medication while confined to a prison hospital facility.

In urging against this conclusion, the government argues that Sell is inapplicable to this case because Magassouba, unlike Sell, does not challenge the adequacy of the district court's findings supporting his involuntary medication. Rather, he challenges the timing of

22

the district court's medication order, claiming that because the district court failed to find within four months of his initial § 4241(d)(1) confinement a substantial probability that he would attain competence with additional hospitalization, the district court lacked authority to enter the challenged May 10, 2006 order. The government submits that this challenge is akin to a speedy trial claim, which precedent holds is not immediately appealable. See generally United States v. MacDonald, 435 U.S. 850, 858-60 (1978); United States v. Reale, 834 F.2d 281, 283 (2d Cir. 1987). We are not persuaded.

The jurisdictional dismissal of a speedy trial challenge results in a defendant going to trial. If the trial results in acquittal, there is no harm to review. If it results in conviction, the alleged speedy trial error can be fully addressed on direct appeal. But the jurisdictional dismissal of an involuntary treatment challenge results in an action – forcible medication – that cannot be effectively reviewed and remedied after trial for reasons explained in Sell, 539 U.S. at 176-77. This conclusion applies regardless of whether the defendant's ground for challenging the involuntary treatment order is the purported inadequacy of the district court's findings, as in Sell, or its alleged lack of authority to enter the order at all, as in this case. Thus, here, no less than in Sell, the challenged order conclusively resolves against the defendant the legal question of his right not to be subjected to involuntary psychiatric treatment. Here, as in Sell, that legal question is distinct from the merits of the underlying criminal action. See generally United States v. Charters, 829 F.2d 479, 484 (4th Cir. 1987) (observing that court's authority over defendant's person is necessary prerequisite to any

23

forcible medication order).  Finally, in this case, as in <u>Sell</u>, once the defendant is forcibly medicated, the challenged treatment order is effectively unreviewable.

<u>United States v. deShazer</u>, 451 F.3d 1221 (10th Cir. 2006), cited by the government, warrants no different conclusion.  In that case, the Tenth Circuit ruled that an appeal from the denial of a motion to dismiss an indictment on grounds of prejudicial delay in resolving defendant's competency was "in reality, a disguised speedy-trial claim," and it dismissed the case for lack of jurisdiction.  <u>Id.</u> at 1222.  Although Magassouba, like deShazer, also appeals the denial of a dismissal motion based on delay in his competency proceedings, his case differs from <u>deShazer</u> in a critical respect.  In <u>deShazer</u>, the district court had not ordered the defendant's involuntary medication.  Thus, the net effect of jurisdictional dismissal in <u>deShazer</u> was simply to allow the defendant's competency review to continue.  If his case proceeded to trial, his claim that delay prejudiced his defense could be reviewed after judgment.  By contrast, the immediate effect of jurisdictional dismissal in Magassouba's case will be his involuntary medication without any effective opportunity for appellate review of that action.  <u>See</u> <u>Sell v. United States</u>, 539 U.S. at 176-77.

Accordingly, because we conclude that this appeal, like that in <u>Sell</u>, satisfies the collateral order doctrine, we proceed to exercise jurisdiction.

B.     <u>The District Court Did Not Exceed Its Authority in Issuing the Challenged §
       4241(d)(2)(A) Order</u>

Magassouba submits that a district court is not authorized to commit an incompetent defendant for "additional" hospital treatment pursuant to 18 U.S.C. § 4241(d)(2) unless it

24

finds, before the conclusion of the defendant's § 4241(d)(1) hospitalization "not to exceed four months," a substantial probability that the defendant will attain competency in the foreseeable future. The government agrees that § 4241(d)(2) commitment cannot be authorized without the requisite substantial probability finding, but it disputes that such a finding must be made before the end of § 4241(d)(1) hospitalization.[8] Because the parties' disagreement depends on the proper construction of § 4241(d), this appeal raises a question of law that we review de novo. See, e.g., United States v. Olmeda, 461 F.3d at 278.

1. The Term of a Defendant's Evaluative Hospitalization Under § 4241(d)(1) Does Not Set a Deadline Beyond Which a District Court Lacks Authority to Order Additional Restorative Hospitalization Under § 4241(d)(2)

a. Background to the Enactment of 18 U.S.C. § 4241

Before discussing the relevant text of § 4241, we recognize two well-established principles that necessarily underlie this statute. The first principle recognizes the sovereign's "[p]ower to bring an accused to trial" as "fundamental to a scheme of 'ordered liberty' and

---

[8] The parties have devoted considerable energy to disputing when the district court first made the substantial probability finding required by § 4241(d)(2)(A). Because the parties' letters of June 29, 2005, and July 1, 2005, reported their agreement that the record demonstrated such a probability, there was little need for the district court to make detailed findings. In fact, we think its probability finding can be inferred from its July 15, 2005 order requesting more information on a difficult question – involuntary treatment – that it did not need to address unless it was satisfied that there was a substantial probability that the defendant would regain competency with additional custodial hospitalization for the prescribed course of treatment. The conclusion does not, however, dispose of defendant's statutory challenge because (1) § 4241(d)(1) limited defendant's custodial hospitalization under that subsection to four months; and (2) whatever predicate findings the district court may have made by July 2005, it did not enter a § 4241(d)(2)(A) order until May 10, 2006.

25

prerequisite to social justice and peace." Illinois v. Allen, 397 U.S. 337, 347 (1970) (Brennan, J., concurring) (cited with approval in Riggins v. Nevada, 504 U.S. 127, 135-36 (1992)). The second holds that, consistent with due process, "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171 (1975) (noting that principle was cited by Blackstone, 4 William Blackstone, Commentaries *24); see Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Pate v. Robinson, 383 U.S. 375, 378 (1966); accord Harris v. Kuhlmann, 346 F.3d 330, 349 (2d Cir. 2003).

To accommodate these two principles, federal law has long allowed the government to commit an incompetent defendant to custody in order to render him competent to stand trial. The original statutes, 18 U.S.C. §§ 4244, 4246 (1949), provided no time limit on such confinement. To avoid constitutional concerns with the prospect of indefinite commitment, federal appeals courts imposed a "rule of reasonableness" on the statutes, construing them to allow commitment "only for a 'reasonable period of time' necessary to determine whether there is a substantial chance of [the defendant] attaining the capacity to stand trial in the foreseeable future." Jackson v. Indiana, 406 U.S. 715, 733 (1972) (citing relevant cases). In Jackson, the Supreme Court itself ruled that such a reasonableness requirement was mandated by due process. Id. at 731 (proscribing "indefinite commitment of a criminal

26

defendant solely on account of his incompetency to stand trial"). To comport with due process,

> a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal.

Id. at 738.

Responding to due process concerns identified in Jackson v. Indiana, in 1984, Congress enacted 18 U.S.C. § 4241. See S. Rep. No. 98-225, at 236 (1984) (noting that, "[i]n accord with the Supreme Court's holding in Jackson v. Indiana, commitment under section 4241 may only be for a reasonable period of time necessary to determine if there exists a substantial probability that the person will attain the capacity to permit the trial to go forward in the foreseeable future"); see also United States v. Strong, 489 F.3d 1055, 1061 (9th Cir. 2007) (observing that § 4241(d) "was enacted in response to the Jackson decision and echoed Jackson's language"); United States v. Donofrio, 896 F.2d 1301, 1302 (11th Cir. 1990) (same); United States v. Shawar, 865 F.2d 856, 864 (7th Cir. 1989) (same); United States v. Filippi, 211 F.3d at 652 (same).

b.     The Statutory Text

In considering Magassouba's argument that § 4241(d)(2)(A) did not authorize the district court to order "additional" custodial hospitalization in his case outside the time frame

27

of its four-month § 4241(d)(1) order, we begin, as we must with the language of the statute. See, e.g., Bailey v. United States, 516 U.S. 137, 144 (1995). Where "statutory language is unambiguous," and where "the statutory scheme is coherent and consistent," our inquiry need go no further. Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (internal quotation marks omitted). In determining whether statutory language is ambiguous, we "reference . . . the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341; accord United States v. Boccagna, 450 F.3d 107, 114 (2d Cir. 2006). "Only if we conclude that statutory language is ambiguous 'do we resort . . . to canons of construction and, if the meaning [still] remains ambiguous, to legislative history.'" United States v. Boccagna, 450 F.3d at 114 (quoting Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 423 (2d Cir. 2005)). Among the canons of construction relevant to our resolution of any textual ambiguity is the rule of constitutional avoidance, which instructs that "where an otherwise acceptable construction of a statute would raise serious constitutional problems," a court should "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988); see Clark v. Martinez, 543 U.S. 371, 380-82 (2005); United States v. Martinez, 525 F.3d 211, 215-16 (2d Cir. 2008); United States v. Gonzalez, 420 F.3d 111, 123-25 (2d Cir. 2005).

Applying these principles to this case, we readily identify certain language in § 4241 as unambiguous on its face. The statute plainly states that, if a district court finds by a

28

preponderance of the evidence that a defendant is mentally incompetent to stand trial, "the court shall commit the defendant to the custody of the Attorney General." 18 U.S.C. § 4241(d) (emphasis added). In short, in contrast to the discretion afforded district courts in deciding whether to commit a defendant for a preliminary competency examination, see id. § 4241(b) (providing that district court "may order" a psychiatric or psychological examination of defendant's competency pursuant to § 4247(b)); id. § 4247(b) (providing that district court "may commit" defendant for competency examination pursuant to § 4241), once a defendant is found incompetent, commitment pursuant to § 4241(d) is mandatory. See United States v. Ferro, 321 F.3d 756, 761 (8th Cir. 2003) (noting that although "[i]t is clear that the statutory scheme detailed by Congress in § 4241(d) provides the district court with the discretion to initially determine whether the defendant is competent to stand trial . . . after determining that a defendant is incompetent . . . a district court is required to commit the defendant to the custody of the Attorney General for a reasonable period of time to evaluate whether treatment would allow the trial to proceed"); United States v. Filippi, 211 F.3d at 651 (stating that statute establishes non-discretionary general rule of commitment without a "case-by-case choice by the district court as to whether to incarcerate once the incompetency finding has been made"); United States v. Donofrio, 896 F.2d at 1302 (holding that commitment under § 4241(d) is "mandatory" once court determines defendant to be incompetent); United States v. Shawar, 865 F.2d at 860 (holding that "plain meaning" of phrase "shall commit" is "that once a defendant is found incompetent to stand trial, a district court has no discretion in whether or not to commit him").

29

For a defendant such as Magassouba, already detained as a risk of flight and danger to the community pursuant to 18 U.S.C. § 3142, the commitment mandate of § 4241(d) might be viewed as duplicative in depriving him of basic liberty. But the text of § 4241(d) goes further, mandating both a particular place and condition of confinement: "[t]he Attorney General shall hospitalize the defendant for treatment in a suitable facility." 18 U.S.C. § 4241(d) (emphasis added). At the same time that § 4241(d) mandates custodial hospitalization and treatment for defendants found mentally incompetent to stand trial, two subsections of the statute limit the time and purpose of such commitments.

> Section 4241(d)(1) authorizes custodial hospitalization
>
> for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future [the defendant] will attain the capacity to permit the proceedings to go forward.

As this language makes plain, the initial purpose of custodial hospitalization is evaluative: "to determine whether there is a substantial probability that in the foreseeable future [the defendant] will attain the capacity to permit the proceedings to go forward." Id. § 4241(d)(1). Consistent with Jackson v. Indiana, an incompetent defendant may be hospitalized for such an evaluative purpose only for "a reasonable period of time, not to exceed four months." Id. This four-month limitation is, in fact, the only explicit time reference in § 4241, and the lack of any provision for its extension appears deliberate in light of § 4247(b), which authorizes commitment "not to exceed thirty days" to make an initial determination of a defendant's competency, but allows for a reasonable extension "not to

30

exceed fifteen days." See generally Hamdan v. Rumsfeld, 548 U.S. 557, 578 (2006) (noting "familiar principle of statutory construction" that "negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute"); Lindh v. Murphy, 521 U.S. 320, 326-30 (1997) (same).

Section 4241(d)(2) authorizes custodial hospitalization for an additional reasonable period of time until –

> (A) [the defendant's] mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or

> (B) the pending charges against him are disposed of according to law; whichever is earlier.

This language makes clear that the purpose of custodial hospitalization pursuant to subpart (A) is restorative: "until – (A) [the defendant's] mental condition is so improved that trial may proceed." 18 U.S.C. § 4241(d)(2)(A).[9] Such restorative hospitalization is limited to an "additional reasonable period" necessary to that specified purpose. The fact that Congress placed no outside limit on this reasonable period (akin to the four months referenced in § 4241(d)(1)) affords district courts considerable discretion in making case-by-case

---

[9] Section 4241(d)(2)(B), which is written in the alternative and applies only when disposition of the pending criminal charges "is earlier" than defendant's restoration to competency under § 4241(d)(2)(A), is most obviously construed to permit additional custodial hospitalization of incompetent defendants who are not expected to regain competency until the criminal charges against them are dismissed in favor of civil commitment proceedings. We need not here consider or decide whether this statutory subsection admits any broader interpretation.

31

determinations as to what reasonable period of additional custodial hospitalization will likely restore a defendant to competency consistent with due process. Congress's use of the word "additional" plainly signals its intent for any restorative commitment pursuant to § 4241(d)(2)(A) to follow evaluative commitment pursuant to § 4241(d)(1). Such additional commitment is not, however, presumed. To the contrary, § 4241(d)(2)(A) commitment is authorized only "if the court finds that there is a substantial probability that within such additional period of time [the defendant] will attain the capacity to permit the proceedings to go forward." Id.

What the statutory text does not clearly state is when the district court must make this finding. Defendant submits that the finding must be made before expiration of the defendant's § 4241(d)(1) commitment because nothing in the statute references an interruption between § 4241(d)(1) and § 4241(d)(2) commitments. Magassouba's argument finds its strongest support in the statute's mandate that district courts "shall commit" incompetent defendants. Id. § 4241(d). The statutory structure appears to contemplate that such commitment shall continue until the defendant is either restored to competency, in which case the district court "shall order his immediate discharge" from hospital confinement with further detainment subject to the Bail Reform Act, id. § 4241(e) (referencing chapter 207 of Title 18, which includes the Bail Reform Act), or, in the event the court determines that the defendant has not so improved, he is referred for possible civil commitment proceedings pursuant to 18 U.S.C. §§ 4246 and 4248, see id. § 4241(d).

32

We nevertheless find defendant's proposed construction of § 4241(d)(1) unconvincing. It ascribes to Congress an intent more focused on ensuring that a defendant's entire term of custodial hospitalization be uninterrupted – something not mandated by due process – than that an "additional" period of custodial hospitalization under 18 U.S.C. § 4241(d)(2)(A) be ordered only after a district court is satisfied as to the substantial probability that it will restore a defendant to competency – a due process requirement, see Jackson v. Indiana, 406 U.S. at 738. We are mindful that circumstances can frequently arise that preclude a diligent district judge from making the required substantial probability finding within four months of a defendant's § 4241(d)(1) hospitalization. Indeed, those circumstances can themselves implicate the defendant's exercise of constitutional rights.

Specifically, a defendant may wish to oppose additional § 4241(d)(2)(A) commitment, and affording him sufficient time to exercise this due process right may delay the district court's substantial probability finding beyond the four-month limit on the defendant's § 4241(d)(1) hospitalization. To present effective opposition, defense counsel will need time to review the BOP record, to consult with the defendant, and to retain one or more independent mental health professionals. Those experts may, in turn, need time to examine the defendant, to review BOP records for themselves, and to prepare their own evaluations of defendant's ability to attain competency. Thereafter, government counsel will undoubtedly seek a reasonable time to respond, whereupon the court may require an evidentiary hearing and briefing to permit it to make a careful finding as to whether there is

33

a substantial probability of defendant attaining competency with additional custodial hospitalization. This sequence of events can easily take longer than four months, even when the parties and the court give the matter diligent attention.

To construe the four-month limit on the term of custodial hospitalization under § 4241(d)(1) as a four-month limit on the court's authority to order additional confinement under § 4241(d)(2)(A) thus raises due process concerns.[10] It is well-established that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Jones v. United States, 463 U.S. 354, 361 (1983) (quoting Addington v. Texas, 441 U.S. 418, 425 (1979)). More to the point, "where liberty is at stake, due process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." United States v. Abuhamra, 389 F.3d at 322. Thus, in the absence of a clear statement by Congress placing a time limitation on district courts' decisional authority to order § 4241(d)(2)(A) hospitalization, we decline to infer one from the evaluative confinement limit specified in § 4241(d)(1).[11] Indeed, the due process concern we identify is compounded when the § 4241(d)(2)(A) order at issue would authorize a defendant's

---

[10] The fact that these particular concerns are not at issue in this case is irrelevant to our obligation to construe the statute to avoid serious constitutional problems that could thus arise in many custodial hospitalization cases.

[11] Where Congress itself imposes procedural limitations, courts generally recognize them to define the process due. Still even such limitations may run afoul of due process if they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. See Medina v. California, 505 U.S. 437, 445 (1992).

34

involuntary medication. A defendant opposing such an order is entitled to reasonable time to develop and present evidence on a host of complex issues – medical and legal – identified in Sell v. United States, 539 U.S. at 180-81. Cf. United States v. Rivera-Guerrero, 426 F.3d 1130, 1138-44 (9th Cir. 2005) (identifying error in district court's refusal to grant defendant continuance to secure independent medical opinions before ordering involuntary medication while defendant committed pursuant to § 4241(d)(1)). Further, he is entitled to the district court's full and careful consideration of the Sell factors.

The constitutional concern we identify could not be avoided simply by requiring the BOP to report its § 4241(d)(1) determination well in advance of the expiration of an ordered four-month term of custodial hospitalization. First, we are doubtful that such action is contemplated by the statutory scheme. Section 4241(d)(1) authorizes "the Attorney General" to hospitalize an incompetent defendant for a period "not to exceed four months, as is necessary to determine" the probability of his regaining competency. We construe this language to reference a determination by the Attorney General, acting through his agents, the mental health professionals of the BOP. As the Ninth Circuit recently observed in United States v. Strong, the "overarching purpose of commitment under § 4241(d)[1] is to enable medical professionals to accurately determine whether a criminal defendant is restorable to mental competency." 489 F.3d at 1062 (emphasis added). Thus, the Seventh Circuit similarly construes § 4241(d)(1) to "give[] the Attorney General the authority . . . to conduct an in-depth evaluation of the defendant to assess the likelihood that he will regain

35

competency . . . . It is during the evaluation period that <u>the Attorney General</u> has up to four months to assess whether the defendant will regain competency to stand trial." <u>United States v. Shawar</u>, 865 F.2d at 861 (emphasis added).

Second, even if a district court could order § 4241(d)(1) commitment for four months while affording the BOP only a fraction of that period for its evaluation, we expect it will rarely make sense for it to do so. The cases in which a district court anticipates protracted litigation as to the propriety of additional § 4241(d)(2)(A) hospitalization are the very ones in which mental health professionals will likely require a full four months to conduct careful and thorough § 4241(d)(1) evaluations. No one's interests – not the parties', not the court's, and not the public's – are well served by encouraging undue haste in § 4241(d)(1) evaluations. <u>See</u> <u>United States v. Ferro</u>, 321 F.3d at 762 (noting need for "careful and accurate diagnosis" to determine if defendant is restorable to mental competency); <u>accord</u> <u>United States v. Strong</u>, 489 F.3d 1062 (citing <u>Ferro</u> with approval).[12]

Even if it were practical – which we doubt – for district courts routinely to impose evaluation deadlines significantly shorter than four months on the BOP, that action could not, in any event, ensure that the remaining time of § 4241(d)(1) commitment would be sufficient

---

[12] Any number of circumstances may reasonably prevent the BOP from making a reliable § 4241(d)(1) evaluation on a short deadline. A defendant may suffer from a challenging mental defect that precludes speedy evaluation of the probability of his regaining competency, or a defendant may choose to obstruct rather than cooperate with the evaluative efforts of BOP doctors, or a defendant may develop a physical ailment that delays psychiatric treatments relevant to evaluating his ability to attain competency.

36

for the defense to secure and present evidence (including expert evidence) in opposition to further custodial hospitalization, for the government to respond to that challenge, and for the district court to hold hearings or to undertake any other review necessary to make a responsible finding as to the substantial probability of defendant attaining competency with further treatment, particularly treatment involving forced medication. Thus, in the absence of clear congressional direction to the contrary and consistent with the principle of constitutional avoidance, we decline to construe § 4241(d)(1) to impose a four-month deadline on the district court's decisional authority to order § 4241(d)(2) commitment. Instead, we construe § 4241(d)(1) to impose a four-month limit only on the Attorney General's authority to hold an incompetent defendant in custodial hospitalization for the purpose of determining the probability of his regaining competency. If at the end of an ordered term of § 4241(d)(1) hospitalization "not to exceed four months," the district court has not ordered additional hospitalization pursuant to § 4241(d)(2), it does not lose its authority to do so. Rather, upon expiration of a § 4241(d)(1) order and in the absence of a § 4241(d)(2) order, it is the Attorney General who lacks authority to hold the defendant in further custodial hospitalization under § 4241(d). In such circumstances, the Attorney General must restore a defendant to the status quo ante his § 4241(d)(1) confinement.[13]

---

[13] In Magassouba's case, that was general BOP confinement pursuant to § 3142. To the extent Magassouba submits that an incompetent defendant cannot be confined pursuant to § 3142 because he is not "pending trial," our reasons for rejecting that argument are set forth infra at [47-48].

United States v. Baker, 807 F.2d 1315 (6th Cir. 1986), cited by defendant, supports no different statutory construction. Although Baker ruled that § 4241(d) "requires that a determination as to the individual's mental condition be made within four months," id. at 1320, the statement must be read in context. There was no question in Baker of a district court's authority to enter a § 4241(d)(2) order after the four-month period referenced in § 4241(d)(1). Rather, the issue in Baker was the Attorney General's authority to keep a defendant in custodial hospitalization for more than four months – specifically, from September 1985 to March 1986 – in the absence of anything but a § 4241(d)(1) order. In addressing this scenario, Baker ruled:

> This confinement was clearly in excess of four months, and there is nothing in the record to indicate that his period of confinement was properly extended. Therefore, although the court's initial commitment of appellant on September 30th was valid, we hold that there was no authority to confine appellant beyond the four months authorized by section 4241(d).

Id.

Similarly, in United States v. Donofrio, the Eleventh Circuit ruled that § 4241(d)(1) "limits confinement to four months, whether more time [for evaluation of probable recovery] would be reasonable or not," 896 F.2d at 1303. Donofrio explained that "[a]ny additional period of confinement depends upon the court's finding [that] there is a probability that within the additional time [the defendant] will attain capacity to permit trial." Id. But like Baker, Donofrio had no occasion to consider, and thus did not address, the district court's authority to make such a finding after a term of § 4241(d)(1) confinement expired if a

defendant were not held in custodial hospitalization in the interim. See also United States v. Charters, 829 F.2d at 484-86 (reversing forcible medication order and remanding case for further proceedings as defendant's "federal custodians do not at present have legal authority to detain" him because (a) § 4241(d)(1) order had expired, (b) court's finding that he was unlikely to recover precluded detention under § 4241(d)(2), and (c) court had failed to follow procedures necessary for civil commitment pursuant to § 4246). Having now considered the question not addressed in Donofrio and Baker, we conclude that district courts do have the authority to order a defendant's additional custodial hospitalization pursuant to § 4241(d)(2)(A) even after the limited period of evaluative hospitalization under § 4241(d)(1) has expired.

We expect that, when dealing with incompetent defendants, district courts will, in fact, generally strive to avoid breaks in custodial hospitalization by entering § 4241(d)(2) orders, whenever possible, before the expiration of § 4241(d)(1) orders. Such expeditious resolution of custodial treatment issues is to be encouraged. We here hold only that the statute does not affirmatively require a district court to issue a § 4241(d)(2) commitment order before the expiration of § 4241(d)(1) hospitalization order, nor does it strip a district court of the authority to do so thereafter.

### 3. Applying the Statutory Construction to this Case

With this understanding of the statute, we consider the record in this case and conclude that, although the district court did not exceed its authority in issuing the challenged

39

§ 4241(d)(2) order after the conclusion of Magassouba's authorized term of § 4241(d)(1) hospitalization, the Attorney General, acting through his agent, the BOP, did exceed his authority in holding Magassouba in custodial hospitalization pursuant to § 4241(d)(1) for longer than four months. Because this error was harmless, we can readily conclude that it did not undermine the district court's authority to order additional § 4241(d)(2) hospitalization and treatment.

a.   By Holding Magassouba in Custodial Hospitalization for Longer than Four Months, the BOP Exceeded Its Confinement Authority Under § 4241(d)

As detailed in the Background section of this opinion, the district court first found Magassouba incompetent on October 13, 2004, and orally ordered his § 4241(d)(1) commitment that same date. The order was not acted on, however, until approximately November 24, 2004, when it was reduced to writing and served on the United States Marshals Service. As a consequence, the Attorney General did not actually "hospitalize the defendant for treatment," 18 U.S.C. § 4241(d), until December 22, 2004, when Magassouba was admitted to Butner. On January 4, 2005, in response to an unopposed application by the BOP, the district court ordered that Magassouba's § 4241(d)(1) confinement formally commence with his arrival at Butner and that the evaluation period be expanded to four months, to conclude on April 20, 2005. The record indicates that the BOP did not complete its evaluation until May 3, 2005, and that Magassouba remained at Butner until May 12, 2005, when federal marshals transported him to the MCC in New York.

40

Because § 4241(d)(1) is unequivocal in limiting custodial hospitalization under that subsection to a reasonable period of time, "not to exceed four months," we necessarily conclude that the Attorney General exceeded its authority in holding Magassouba in custodial hospitalization through May 12, 2005, approximately three weeks longer than the four months specified in the court's unopposed order of January 4, 2005.[14]

### b. A § 4241(d)(1) Error May Be Reviewed for Harmlessness

Having identified § 4241(d)(1) error by the BOP, we consider whether such error may be deemed harmless because a harmless error certainly would not warrant the relief Magassouba seeks: dismissal of the indictment.[15]

Rule 52 of the Federal Rules of Criminal Procedure states that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." The presumptive reach of this rule is broad. See Neder v. United States, 527 U.S. 1, 7 (1999) (noting that harmless error presumptively applies to "all errors where a proper objection is made" (emphasis in original)); Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988) ("Rule 52 is, in every pertinent respect, as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rule's mandate than

---

[14] Even if further inquiry were to reveal that Magassouba's custodial hospitalization ended on May 3, 2005, when Butner officials advised federal marshals that he could be transported back to New York for further proceedings, we would still have to conclude that the BOP had exceeded its § 4241(d)(1) detention authority, even if only by two weeks.

[15] For reasons discussed infra at **[45 n.16]**, we are inclined in any event to think that writs of mandamus or habeas corpus are the remedies available to a defendant detained in violation of § 4241(d)(1), not dismissal of the indictment.

41

they do to disregard constitutional or statutory provisions."). Thus, to demonstrate that a particular error is not subject to Rule 52 review, a defendant must point to "strong support" for that conclusion. Zedner v. United States, 547 U.S. 489, 507 (2006). In Zedner, a case in which a trial court failed to make findings specifically required by the Speedy Trial Act, see 18 U.S.C. § 3161(h)(8), the Supreme Court identified such strong support in the statute's language, which was unequivocal both as to the findings mandated to extend the statute's time limitations and the remedy required for exceeding those limitations, i.e., dismissal of the indictment. See Zedner v. United States, 547 U.S. at 506-08.

This case is readily distinguishable from Zedner because, although § 4241(d)(1) is unequivocal in its mandate that evaluative hospitalization be limited to a reasonable period "not to exceed four months," the statute nowhere indicates an appropriate remedy for failing to abide by this limitation. Certainly, nowhere does the statute mandate the dismissal remedy that Magassouba seeks on this appeal. See generally United States v. Ecker, 78 F.3d 726, 728 (1st Cir. 1996) (holding that incompetent defendant subject to civil commitment proceedings could not compel government to dismiss charges against him because "there is nothing in the statute's language that requires dismissal of a pending indictment"). Nor is such relief constitutionally required. In Jackson v. Virginia, 406 U.S. at 738, the Supreme Court identified a due process denial in the more-than-three-year detention of an incompetent defendant without a substantial probability finding. Nevertheless, the Court did not order dismissal of the charges. Rather, it remanded the case to the state courts for them to decide,

42

in the first instance, whether there was a substantial probability that Jackson could be restored to competency within a reasonable time and, if so, to ensure that his continued commitment was justified by progress toward that goal. See id.[16]

Accordingly, we conclude that the § 4241(d)(1) error noted in this case may be reviewed for harmlessness. Indeed, that conclusion finds some support in the decisions of our sister circuits according Rule 52 review to other errors arising in competency proceedings. See United States v. Denkins, 367 F.3d 537, 545 (6th Cir. 2004) (identifying district court's failure to hold competency hearing required by § 4241(a) as "the very essence

---

[16] Although we here note the unavailability of a dismissal remedy in either § 4241(d) or Supreme Court precedent to support harmless error review of the statutory error alleged in this case, we do not suggest an incompetent defendant is without significant remedies for unlawful confinement. Such a defendant may petition this court for a writ of mandamus to compel an inattentive district court to make the findings required by law to support the challenged confinement. While the conditions necessary to secure mandamus relief are not easily met, see Stein v. KPMG, LLP, 486 F.3d 753, 759-60 (2d Cir. 2007), even mandamus denials can be fashioned to encourage prompt action by a district court, see, e.g., McGann v. State of N.Y., 77 F.3d 672, 673 n.1 (2d Cir. 1996) (noting that district court ruling followed this court's order denying petition for writ of mandamus "without prejudice to renew if the district court failed to rule on his motions within 30 days"). A defendant may also petition for a writ of habeas corpus to secure release from unlawful custody. Because habeas corpus originates in equity, it affords courts considerable flexibility to intervene to ensure that cases of confined incompetent defendants are not allowed to languish, whether the statute is alleged to be unlawful under § 4241(d), § 3142, some other statute, or the Constitution. See Stone v. Powell, 428 U.S. 465, 491 n.31 (1976) (describing habeas corpus "as a remedy for 'whatever society deems to be intolerable restraints'" granted to "'persons whom society has grievously wronged'" (quoting Fay v. Noia, 372 U.S. 391, 401 (1963))). To be sure, an incompetent defendant cannot be expected to pursue these remedies himself, but that is precisely why he has an attorney whose responsibility it is to safeguard the defendant's legal interests. Cf. United States v. Purnett, 910 F.2d 51, 55 (2d Cir. 1990) (holding that defendant whose competency is challenged cannot waive right to counsel and represent himself).

of a 'harmless error'" because all pertinent portions of process subsequently were employed at behest of defendant); United States v. Barfield, 969 F.2d 1554, 1556-57 (4th Cir. 1992) (applying harmless error review to competency proceeding); Sturgis v. Goldsmith, 796 F.2d 1103, 1109 (9th Cir. 1986) (same).

### c. The Scope of the § 4241(d)(1) Error

Before undertaking harmlessness review, we consider defendant's argument that the scope of the § 4241(d)(1) error is, in fact, far greater than a mere two or three weeks of unauthorized custodial hospitalization at Butner. Magassouba asserts that he was in § 4241(d)(1) custody for at least nineteen months, from the district court's initial oral order of October 13, 2004, until its challenged § 4241(d)(2) order on May 10, 2006. We are not persuaded.[17]

To the extent Magassouba seeks to have the period from October 13, 2004, to December 22, 2004, when he was admitted to Butner, treated as § 4241(d)(1) custody, a question of waiver is raised by his counsel's failure to object to the district court's January 4, 2005 order dating the defendant's § 4241(d)(1) commitment to commence with his arrival at Butner. Similarly, the fact that, between May 12, 2004, when Magassouba was discharged from Butner, and March 22, 2006, when he moved to dismiss the indictment, his counsel

_____

[17]Although we reject Magassouba's claim that the identified nineteen months of confinement must be viewed as a whole in assessing the § 4241(d)(1) violation, we nevertheless conclude, for reasons discussed infra at **[51-53]**, that this period of detention is properly considered in assessing defendant's due process challenge to further confinement.

44

never requested release from custody but, rather, urged the district court to order additional custodial hospitalization suggests possible invited error. See generally United States v. Quinones, 511 F.3d 289, 321 (2d Cir. 2007) (comparing waivers resulting from defendant's failure to object to purported error with those attributable to "invited error").[18] We need not here decide the difficult question of whether these waiver principles apply against an incompetent defendant, see, e.g., United States v. Purnett, 910 F.2d at 55 ("Logically, the trial court cannot simultaneously question a defendant's mental competence to stand trial and at one and the same time be convinced that the defendant has knowingly and intelligently waived his right to counsel."); Pate v. Robinson, 383 U.S. 375, 384 (1966) ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."), because we identify an alternate ground for rejecting Magassouba's claim that he was in § 4241(d)(1) custody for nineteen months.

By its terms, § 4241(d)(1) confinement is limited not only as to time and purpose but also as to place: the Attorney General must "hospitalize the defendant for treatment in a suitable facility." 18 U.S.C. § 4241(d)(1) (emphasis added). The only facility where Magassouba appears to have been held in custodial hospitalization is Butner, where he was confined for four months and three weeks. To the extent Magassouba was otherwise

---

[18] Our identification of possible waiver or invited error to should not be construed as any criticism of the representation afforded Magassouba by his able counsel.

generally detained at the MDC or MCC, that commitment was authorized not by § 4241(d)(1) but by the Bail Reform Act, 18 U.S.C. § 3142.[19] Magassouba was ordered detained at the very start of this case as a presumptive risk of flight and a danger to the community pursuant to § 3142(e). While Magassouba never challenged his § 3142 detention in the district court, he contends on appeal that the statute could not authorize his detention after October 13, 2004, the date the district court found him incompetent pursuant to § 4241(d), because § 3142 applies only to cases "pending trial," 18 U.S.C. § 3142(a), and due process prohibits the trial of an incompetent defendant. Magassouba's argument conflates the concept of "pending trial" with that of being "on trial." While an incompetent criminal defendant cannot be placed "on trial" consistent with due process, there is no similar constitutional bar to his remaining "pending trial" while competency proceedings are resolved. In Jackson v. Indiana, the Supreme Court specifically held that the due process proscription on putting an incompetent defendant "on trial" did not preclude a court from conducting certain pretrial proceedings in his criminal case. See 406 U.S. at 740-41 (noting that states were not precluded from "allowing at a minimum, an incompetent defendant to raise certain defenses such as insufficiency of the indictment, or make certain pretrial motions through counsel that

_____

[19] We do not consider on this appeal the possibility of the Attorney General satisfying the hospitalization mandate of § 4241(d) by designating an incompetent defendant to the medical wing of pretrial detention facilities. Nor do we here address whether the time a defendant, who is not otherwise detained pursuant to § 3142, spends in marshals' custody being transported to or from a prison hospital facility must be counted within the four-month term of § 4241(d)(1) custodial hospitalization.

did not require personal participation of the defendant" (citing Model Penal Code § 4.06(3)). A court necessarily conducts such proceedings pending a defendant's trial.[20] Because we conclude that Magassouba remains pending trial through the completion of § 4241 proceedings, we necessarily reject his argument that he was no longer "pending trial" after the October 13, 2004 finding of incompetency and, therefore, no longer detainable under § 3142.

We have identified one unpublished decision, United States v. Peppi, No. 06-157, 2007 U.S. Dist. LEXIS 13997 (D.N.J. Feb. 27, 2007), in which a court declined to find that trial was pending against an incompetent defendant and, therefore, refused to impose release conditions under the Bail Reform Act. The case is factually distinguishable from the one before us in important respects. Specifically, in Peppi, the defendant's inability to regain competency was undisputed, and he had been referred for civil commitment pursuant to § 4246. It was in that context that the court observed that "[b]ecause Mr. Peppi cannot be brought to trial now, it seems an impermissible fiction to pretend that one is pending. If not pending trial, then the Bail Reform Act does not apply." 2007 U.S. Dist. LEXIS 13997, at *15. We need not here decide what conclusion we would reach on facts similar to those in Peppi. We note simply that Magassouba has not been referred for civil commitment pursuant

_____

[20] A defendant charged with an offense is viewed as "pending trial" from his first appearance before a judicial officer because the Constitution gives him the right to have the charged offense resolved through that particular proceeding. U.S. Const. amend VI (guaranteeing criminal defendant right to "speedy and public trial").

to § 4246 as a defendant unlikely to attain competency. Indeed, not only are § 4241(d) proceedings pending; the district court has specifically found pursuant to § 4241(d)(2) that there is a substantial probability that Magassouba will attain competency with appropriate medication. In these circumstances, we indulge no fiction to conclude that Magassouba remains pending trial.[21]

Accordingly, we conclude that the § 4241(d)(1) confinement error in this case is limited to the three weeks in excess of four months that Magassouba was held in custodial hospitalization at Butner.

####   d.   The Identified § 4241(d)(1) Error Was Harmless

In reviewing the identified error for harmlessness, we consider what prejudice to substantial rights Magassouba sustained therefrom, and we identify none. See, e.g., United States v. Mejia, 356 F.3d 470, 476 (2d Cir. 2004) (holding that ex parte communication by

---

[21] No different conclusion is required by 18 U.S.C. § 4241(e), which expressly states that, in the case of a defendant who regains competency, "[u]pon discharge" from custodial hospitalization, "the defendant is subject to the provisions of chapter[] 207," which includes the Bail Reform Act. We do not construe this language to indicate that a § 3142 order of detention is somehow vacated by a § 4241(d) hospitalization order. Rather, we understand this language to signal Congress's intent to give full force to § 3142 and any order entered pursuant thereto whenever a defendant pending trial is not in hospital confinement. To be sure, Congress specifically addressed only hospital discharge occurring after a defendant's competency is restored. The explanation likely lies in our earlier observation that Congress did not anticipate circumstances requiring a discharge from § 4241(d)(1) evaluative hospitalization before the commencement of § 4241(d)(2) restorative hospitalization. See supra at **[34]**. Nevertheless, nothing in the statutory text of § 4241(d) signals Congress' intent that, in any such an interval, a defendant who posed a risk of flight or a danger to the community would not remain in custody pending trial pursuant to § 3142.

judge to jury in response to inquiry is harmless error where communication does not prejudice defendant); United States v. Diaz, 176 F.3d 52, 98 (2d Cir. 1999).[22]

First, the unauthorized § 4241(d)(1) hospitalization did not deprive Magassouba of basic liberty. Had Magassouba been discharged from hospitalization under that statute at the conclusion of the maximum four-month period, he would not have been released from BOP custody. Rather, for reasons discussed in the preceding section, Magassouba would have been returned to pretrial detention pursuant to the Bail Reform Act, 18 U.S.C. § 3142(e). Second, Magassouba does not contend that he sustained a greater loss of liberty in his final three weeks at Butner than he would have experienced in a comparable time at a pretrial detention facility such as the MCC or MDC. It is, after all, undisputed that Magassouba was not subjected to involuntary medication during this period. Third, the unauthorized detention did not prejudice Magassouba in stating his position to the court on additional § 4241(d)(2)(A) confinement. As already noted, defense counsel urged additional custodial

---

[22]Although harmlessness review is most frequently employed after a judgment of conviction to determine whether error prejudiced the outcome of a defendant's trial, see, e.g., United States v. Kaplan, 490 F.3d 110, 122 (2d Cir. 2007) (noting that harmlessness of non-constitutional error is determined by reference to whether error "did not influence the jury, or had but very small effect" (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)); United States v. Dukagjini, 326 F.3d 45, 62 (2d Cir. 2003) (holding that non-constitutional error affects substantial rights if it had "substantial and injurious effect or influence" on jury's verdict), the breadth of Rule 52 supports harmlessness review in other circumstances, see, e.g., United States v. Thompson, 287 F.3d 1244, 1253-54 (10th Cir. 2002) (employing harmless error analysis in appeal of dismissal of indictment due to impropriety of sealing under Fed. R. Crim. P. 6(e)(4) by inquiring whether sealing error "substantially influenced a defendant's ability to defend against the charges").

49

hospitalization, and Magassouba does not challenge the merits of the district court's § 4241(d)(2) order on this appeal. Finally, the statutory error in this case does not rise to the level of a due process violation under Jackson v. Indiana. Although Congress has established a maximum four-month period of custodial hospitalization to evaluate the probability of an incompetent defendant regaining competency to stand trial, due process itself draws no such bright time line. See Jackson v. Indiana, 406 U.S. at 738-79 (declining "to prescribe arbitrary time limits," although noting that defendant had "been confined for three and one-half years on a record that sufficiently establishes the lack of a substantial probability that he will ever be able to participate fully in a trial"). At whatever point it becomes constitutionally unreasonable to confine an incompetent defendant for any further time solely to evaluate his competency to stand trial, we are satisfied that the line is not crossed at four months and three weeks. See infra at **[53-59]** (explaining why even nineteen-month detention did not violate due process in this case).

In sum, although we identify error by the Attorney General in confining Magassouba to custodial hospitalization for two to three weeks longer than permitted by § 4241(d)(1), we conclude that the error was harmless. As such, we need not consider whether such an error could ever undermine a district court's authority to order additional § 4241(d)(2) confinement. We can confidently conclude that it had no such effect in this case.

C.      Due Process Did Not Require the District Court to Dismiss the Indictment

Although we reject Magassouba's statutory challenge to the district court's entry of a § 4241(d)(2) order on May 20, 2006, we proceed to consider his constitutional claim that,

50

by that date, his continued confinement for the purpose of restoring competency to stand trial was no longer reasonable.

In Jackson v. Indiana, the Supreme Court identified a due process concern with committing a defendant "solely on account of his incapacity to proceed to trial" for "more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." 406 U.S. at 738 (emphasis added). As we have already observed, for much of the time between the district court's October 13, 2004 finding of incompetence and its challenged May 20, 2006 order, Magassouba was not confined solely to evaluate the probability of his regaining competency. He was also detained pursuant to the Bail Reform Act, 18 U.S.C. § 3142, as a risk of flight and danger to the community. We nevertheless conclude that the totality of Magassouba's post-October 13, 2003 confinement is appropriately considered in determining whether further commitment beyond May 20, 2006 was so unreasonable as to violate due process.

We reach this conclusion mindful that the reasonableness of a defendant's § 3142 detention is generally defined by statutory and constitutional rights to a speedy trial. Under the Speedy Trial Act, however, any period spent resolving a defendant's competency to stand trial is excluded from consideration when determining the date by which a defendant must be brought to trial. See 18 U.S.C. § 3161(h)(1)(A) (excluding from Speedy Trial Act consideration any "delay resulting from any proceeding, including any examinations, to determine the mental competency . . . of the defendant"). We think that implicit in this

51

statutory exclusion is an assumption that defendant's competency proceedings will be resolved within the reasonable time requirements of due process. Otherwise, in a circumstance where a § 4241(d)(1) order expired and no § 4241(d)(2) order was entered, § 3142 could itself become the vehicle for doing what the Due Process Clause proscribes: subjecting incompetent defendants to indefinite commitment. Thus, we conclude that, once a defendant is found incompetent, continued confinement while the parties and the court assess his ability to regain competency must comport with the reasonable time limitations of due process, regardless of whether that confinement involves custodial hospitalization pursuant to § 4241(d) or general detention pursuant to § 3142.[23]

The nineteen-month period Magassouba spent in BOP custody from October 13, 2004, when he was found incompetent, to May 10, 2006, when the court entered the challenged § 4241(d)(2) order, is not insignificant. Nevertheless, we conclude that the time was not constitutionally unreasonable because Magassouba's refusal to accept the treatment likely to render him competent required the district court to address distinct and difficult due process concerns relating to involuntary medication preliminary to entering the challenged § 4241(d)(2) order.

In reaching this conclusion, we reiterate our earlier observation that the Constitution itself draws no bright lines signaling when an incompetent defendant's continued detention

___

[23] We do not here decide whether a different conclusion might apply when a defendant is confined pursuant to some other authority as, for example, when a defendant is confined on a judgment of conviction or as a danger to himself or others within a BOP facility.

to restore competency becomes unreasonable. See Jackson v. Indiana, 406 U.S. at 738. To the extent the government urges us to use the sentence a defendant faces on the underlying charges – in Magassouba's case a term of ten-years-to-life imprisonment – as a benchmark for assessing the reasonableness of confinement to restore competency, see, e.g., United States v. Ecker, 30 F.3d 966, 969 (8th Cir. 1994) (concluding four-year detention not unreasonable in light of fifteen-year mandatory minimum sentence), we note some reservations as to the general utility of that particular tool to the specified task. We do not pursue the matter further because, in this case, we can confidently conclude that, as of May 20, 2006, Magassouba had not been confined for such an unreasonable time as to preclude additional § 4241(d)(2) commitment.

In determining what constitutes a constitutionally unreasonable period of detention for an incompetent defendant, we necessarily consider the totality of the circumstances, including (1) the length of time at issue; (2) the medical assessments of the defendant's ability to attain competency; (3) the reason for any delay in helping the defendant attain competency; (4) the defendant's assertion of his rights, whether as to custody or treatment; and (5) any prejudice to the defendant, whether in attaining competency or in proceeding thereafter to trial.[24] We conclude that these factors do not demonstrate that Magassouba's

---

[24] We conduct a similarly broad review of the totality of relevant circumstances in determining when pretrial confinement violates the Constitution's Speedy Trial Clause. See Barker v. Wingo, 407 U.S. 514, 530-33 (1972) (providing for consideration of (1) length of confinement, (2) reason for delay, (3) defendant's assertion of rights, and (4) prejudice). Of course, the concerns animating due process concerns identified in Jackson v. Indiana are

detention was in violation of due process.

First, as with speedy trial, it is difficult to identify the precise time at which an incompetent defendant's continued detention becomes presumptively unreasonable. Cf. United States v. Vassell, 970 F.2d 1162, 1164 (2d Cir. 1992) (discussing speedy trial). To be sure, the nineteen-month period here at issue is far shorter than the three and one-half years of commitment deemed unreasonable in Jackson v. Indiana, 406 U.S. at 738-39. Nevertheless, mindful that after Magassouba's May 12, 2005 discharge from Butner his incompetency was untreated and his case was not advancing toward trial, we carefully consider other factors to assess the reasonableness of this continued confinement.

Second, in Jackson, the defendant was confined for a lengthy time despite the fact that medical experts had concluded that no effort could render him competent to stand trial in light of his severe mental and physical impairments. See id. at 717-19. By contrast, in this case, all doctors and lawyers agree that there is a substantial probability that Magassouba can regain competency with additional hospitalization and treatment. See supra at **[12-15]**. This immediately distinguishes this case from United States v. Walker, 335 F. Supp. 705, 708-09 (N.D. Cal. 1971) (finding continued commitment unreasonable where court found defendant unlikely to regain competency in near future) and United States v. Jackson, 306 F. Supp. 4, 6 (N.D. Cal. 1969) (finding defendant unlikely to attain competency in foreseeable future),

different from those informing the right to speedy trial. Moreover, the due process inquiry is conducted mindful that defendant, though represented by counsel, has been found incompetent.

54

relied on by defendant. Indeed, where the record establishes a substantial probability that additional confinement will restore a defendant to competency, continued confinement is "reasonable" under the Due Process Clause as long as the commitment is "justified by progress toward that goal." Jackson v. Indiana, 406 U.S. at 738.

Third, insofar as the record indicates any delay in Magassouba's progress toward competency, we identify only brief times when anything less than conscientious attention was being given to his condition.[25] The first such period is the two months – from October 13, 2004, to December 22, 2004 – that it took to transport Magassouba to Butner for § 4241(d)(1) evaluation. The first month's delay appears to be the product of inadvertent human error in communicating the court's § 4241(d)(1) order to federal marshals, a matter quickly resolved by the court when brought to its attention. As for the second month's delay, various holidays in this period may have presented particular transport challenges. Whatever the reason, these transport delays were not so egregious as to deny Magassouba due process.[26]

---

[25] We have already concluded that the four months and three weeks that Magassouba spent in custodial hospitalization, although violative of § 4241(d)(1), was not constitutionally unreasonable. See supra at **[50-51]**. This hospitalization allowed BOP to determine that Magassouba could be rendered competent with appropriate treatment, a conclusion that is undisputed even on this appeal.

[26] We, nevertheless, remind the government that, under the Speedy Trial Act, a presumption of unreasonableness attaches to times in excess of ten days used to transport a detained defendant to another district. See 18 U.S.C. § 3161(h)(1)(H). While this time frame does not control our due process determination, the government is well advised to use it as a benchmark and to alert the district court when circumstances prevent the timely transportation of an incompetent defendant subject to a § 4241(d) order.

55

The second period of delay reflects the BOP's failure to meet court filing deadlines. Instead of submitting its initial evaluation report on the scheduled date of May 20, 2005, the BOP filed its report on May 27, 2005. Similarly, in responding to the court's inquiry for further information, the BOP ignored the scheduled deadline of August 30, 2005, filing its reply on November 10, 2005. We do not condone these unexcused delays; nor do we express any view as to what sanctions a district court might impose in such circumstances. We hold only that they did not unreasonably prolong Magassouba's detention in violation of due process, cf. United States v. Vasquez, 918 F.2d 329, 338 (2d Cir. 1990) (rejecting speedy trial challenge because government's negligent delay in evaluating defendant's competency at Butner was result of "'institutional dysfunction' rather than deliberate wrongdoing or bad faith"). The delay in Magassouba's attainment of competency is largely attributable to his own action, specifically, his invocation while still at Butner of his right to refuse treatment. This required the district court carefully to weigh Magassouba's right to refuse treatment against the public's interest in bringing him to trial if he could, in fact, be restored to competency. In deciding the difficult question whether to order Magassouba's involuntary medication, the district court necessarily expended considerable time reviewing and developing evidence relevant to the factors specified in Sell v. United States, 539 U.S. at 180-81. It is apparent that, during the period from July 15, 2005, to May 10, 2006, the district court diligently pursued the Sell inquiry preliminary to entering the challenged §

4241(d)(2) order.[27] The fact that it did so cautiously both to ensure a result respectful of Magassouba's rights and to afford him some time to reconsider his medication refusal merits commendation not criticism.

Fourth, it was not until March 2006, when Magassouba moved to dismiss the indictment, that he raised any court challenge to his continued confinement. Until that point, defense counsel had actively supported it.[28] Once the motion made it evident that further judicial patience would not secure defendant's cooperation in his own treatment, the district court acted promptly in ordering defendant's additional custodial hospitalization pursuant to § 4241(d)(2), with authorization for involuntary medication.

Fifth, Magassouba has not demonstrated any undue prejudice from his confinement, either to his ability to attain competency or to his ability to defend against the charges at trial.

On the totality of these circumstances, we identify no merit in Magassouba's constitutional claim that, even though it is substantially probable that additional custodial hospitalization and treatment will render him competent, his continued confinement beyond

---

[27] Although a district court may be able to make the substantial probability finding required by § 4241(d)(2) before resolving the question of involuntary treatment, that does not mean that it can enter a commitment order under that subsection. An involuntary medication decision would likely affect both the scope and term of a § 4241(d)(2) order.

[28] As noted earlier, defense counsel's February 15, 2005 letter to the prosecutors urging prompt completion of Magassouba's § 4241(d)(1) evaluation to avoid due process concerns with further detention appears not to have been filed with the court. As for Magassouba, although found incompetent, he communicated with the court both directly (seeking reconsideration of the incompetency finding and new counsel) and through counsel (reiterating his refusal to accept treatment). In no communication before March 2006 does he appear to have challenged his continued confinement.

57

May 10, 2006 for purposes of treatment was so unreasonable as to violate due process and warrant dismissal of the indictment. Accordingly, we affirm the challenged May 10, 2006 order and remand the case for further proceedings.[29]

### III. Conclusion

To summarize, we conclude:

1. Under the collateral order doctrine, we have jurisdiction to review defendant's interlocutory challenge to an order of commitment pursuant to 18 U.S.C. § 4241(d)(2)(A) that authorizes involuntary medication. No different conclusion is warranted because defendant's challenge focuses on the timeliness of the order rather than the grounds for its entry.

2. Magassouba's timeliness challenge fails because § 4241(d)(1) imposes an outside limit of four months only on the time the Attorney General can hold a criminal defendant in custodial hospitalization for purposes of determining the probability of his attaining competency in the foreseeable future. In the absence of a clear statement of congressional intent, we decline to infer from this statutory language a four-month limit on a district court's authority to order a defendant's additional hospitalization for treatment under § 4241(d)(2)(A), particularly as such a construction could raise constitutional concerns about affording defendants a reasonable opportunity to oppose § 4241(d)(2)(A) orders, particularly those providing for involuntary treatment.

---

[29] Mindful of both possible changes in Magassouba's mental condition and advances in medical science, we leave it to the sound discretion of the district court whether to seek updates of the evaluations informing the challenged order.

3.    Although Magassouba's custodial hospitalization pursuant to § 4241(d)(1) exceeded the four-month statutory limit by two to three weeks, this error was harmless in light of the fact that defendant was otherwise detained – without objection – pursuant to the Bail Reform Act, 18 U.S.C. § 3142.  As such, the error could not deprive the district court of authority to order additional § 4241(d)(2) hospitalization and treatment.

4.    Magassouba's constitutional challenge also fails because the totality of the circumstances – including Magassouba's refusal of treatment, which required the district court to engage in the multi-factor analysis outlined in Sell v. United States, 538 U.S. at 180-81, demonstrate that his total nineteen months' confinement from the time he was found incompetent to stand trial until the district court entered the challenged treatment order was not so unreasonable as to violate due process.

ORDER AFFIRMED.